# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MICHELLE MARIE HOLLIS,

    *Plaintiff*,

*v.*                    CASE NO. 2:13-cv-13054

COMMISSIONER OF SOCIAL       DISTRICT JUDGE LAWRENCE P. ZATKOFF
SECURITY,                MAGISTRATE JUDGE PATRICIA T. MORRIS

    *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.   RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment be **DENIED**, that Plaintiff's Motion for Summary Judgment be **GRANTED**, and that the case be remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings.

## II.   REPORT

### A.   Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned to review the Commissioner's decision

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

denying Plaintiff's claims for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401-34 and for Supplemental Security Income ("SSI") under Title XVI, §§ 1381-1383f. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 17, 19.)

Plaintiff Michelle Hollis was forty-eight years old during the most recent administrative hearing. (Transcript, Doc. 13 at 70, 72, 137.) Her work history includes cashier positions, work as a mail room clerk, a job at a freight company, and her last permanent position, at Hankyu Hanshin Express in 1996. (Tr. at 150, 182.) Additionally, she made at least one attempt to work after her alleged disability onset date. (Tr. at 64-65, 344.) On December 3, 2010, Plaintiff filed the present claims for SSI and DBI, alleging that she became unable to work on December 15, 1996. (Tr. at 137, 143.)

The claims were denied at the initial administrative stage. (Tr. at 33-34.) In denying the claims, the Commissioner considered anxiety-related disorders and attention deficit hyperactivity disorder ("ADHD"). (*Id.*) On January 31, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Martha Gasparovich, who considered the application for benefits de novo. (Tr. at 8-32.) In her decision issued on March 27, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 62, 71-72.) Plaintiff requested a review of this decision on April 21, 2012. (Tr. at 14-15.)

The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on February 27, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 6-8.) On June 10, 2013, the Council then denied Plaintiff's request to reopen its determination, but extended the time for instituting a civil action

by thirty days. (Tr. at 1.) On July 16, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.[2] (Compl., Doc. 1.)

### B.    Standard of Review

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations for substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial

---

[2]The Complaint form is dated "July 5" and states Plaintiff received the reopening notice on June 12. (Doc. 1 at Pg ID 1.) An attached scan of the mailing envelope shows Plaintiff sent it on July 11. (*Id.* at Pg ID 26.) As noted, the Court marked it filed on July 16. (Doc. 1.) *See Kellum v. Comm'r of Soc. Sec.*, 295 F. App'x 47, 48-49 (6th Cir. 2008) (finding that filing date occurs when the court date-stamps the filing); *see also Parrott v. Comm'r of Soc. Sec.*, No. 9:95-CV-256, 1995 WL 750152, at *1 (E.D. Tex. Dec. 14, 1995) ("Filing occurs on the date the complaint is received by the court clerk, not the day it was mailed."), *Report & Recommendation adopted by* 914 F. Supp. 147 (E.D. Tex. 1996). Defendant has not raised any possible violation of the statute of limitations, and the Court will not address the issue. *See, e.g.*, *Walker v. Sec'y of Health, Ed. & Welfare*, 449 F. Supp. 63, 64 (E.D. Mich. 1978) ("In light of the Supreme Court's view . . . that the 60 day requirement is a statute of limitations which can be waived, and in view of the fact that the Secretary, in his answer in the instant case has chosen not to raise the statute of limitations, the timeliness of the complaint is not an issue.").

evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a

different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written

5

decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

### C.    Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-434, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D.    ALJ Findings**

7

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured-status requirements through December 31, 2001, and had not engaged in substantial gainful activity since December 15, 1996, the alleged onset date. (Tr. at 64.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: depression and anxiety disorder. (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 65.) At step four, the ALJ noted that Plaintiff did not have any past relevant work. (Tr. at 70.) The ALJ also found that Plaintiff was thirty-three years old on the application date, putting her in the "younger individual" category. (*Id.*) *See* 20 C.F.R. §§ 404.1563, 416.963. (*Id.*) At step five, the ALJ found that Plaintiff could perform jobs, existing in significant numbers in the regional economy, at all exertional levels with various non-exertional limitations. (Tr. 67-71.)

### E.   Administrative Record

### 1.   Medical Records

Plaintiff started seeing Dr. Manuel Dumlao in the early 1990s. (Tr. at 381-98.) The notes are difficult to decipher, but they are labeled "Psychiatry Progress Notes," mentioned an early diagnosis of panic attacks and major depression, and proposed prescribing Xanax, among other drugs. (Tr. at 389-90, 394.) At one session, Dr. Dumlao observed that Plaintiff was "neatly dressed, attractive," and "pleasant," and did not suffer from delusions or suicidal ideations. (*Id.*) In another visit, during 1992, Plaintiff suggested the psychotropic medications helped. (Tr. at 388.) Later notes, from around 1993, indicate Plaintiff tried and rejected Prozac and "couldn't tolerate" Zoloft, which made her feel like a zombie. (Tr. at 395.) It appears Plaintiff received a Prozac prescription again in 1994. (Tr. at 395-96.) The reports also mention she experienced "some limited insomnia."

(Tr. at 395.) Notes from the following years seem to center on Dr. Dumlao's efforts to find the right medication mix. (Tr. at 383-86.) In the summer of 1996, for example, he prescribed Prozac and Xanax. (Tr. at 384.) When she returned two months later, she said her anxiety and stress had increased, she felt dizzy, and she admitted that she stopped taking Prozac. (Tr. at 385.) He switched the prescriptions at the end of the meeting, providing Ativan and Serzone; but notes from the following month and from 1997 show that Prozac was back in the mix. (Tr. at 383-84.) Later in the year she told Dr. Dumlao she hoped to become pregnant, and discussed ceasing the medications. (Tr. at 383, 397.) She had "some anxiety" but "wants to stay off" the medication, she said. (Tr. at 397.)

She visited Dr. Louis Rentz, D.O., in June 1997. (Tr. at 381-82.) He wrote that during an ovarian cyst removal doctors discovered she had stage four endometriosis and provided laser treatments and, later, prescription drugs.[3] (Tr. at 381.) His physical examination was "normal," finding nothing wrong with her gait, senses, or reflexes. (Tr. at 381-82.) The substance of his report, which he sent to Dr. Dumlao, focused on her mental health. She described a history of panic attacks starting at age nineteen, which led to multiple hospitalizations. (Tr. at 381.) Prozac "helped her more than anything," she informed him, adding that concentrating proved difficult at times. (Tr. at 381-82.) Dr. Rentz concluded that she "certainly [has] a history suggesting panic attacks and some agoraphobia," but "has responded very well to Prozac," in contrast to other less effective drugs. (*Id.*) He suggested medications to "modify attention deficit without producing increased anxiety." (*Id.*)

_____

[3] Pelvic ultrasound results from November 1996 verify the ovarian cyst. (Tr. at 265.)

9

A typed note from Dr. Mohammed Razzaque, dated November 1998, states that Plaintiff "has been diagnosed as having panic attacks and would not be a suitable candidate for jury duty." (Tr. at 285.) Plaintiff also provided a juror questionnaire form she received prior to obtaining that note. (Tr. at 284.)

Plaintiff returned to Dr. Dumlao on August 1, 2000, describing anxiety attacks and depression. (Tr. at 391.) During the previous year and a half her parents died and she had a son. (*Id.*) She denied any postpartum depression, but now, thirteen months later, felt depressed. (*Id.*) Her depression manifested in introversion, increased appetite, and excessive sleep. (*Id.*) Dr. Dumlao noted her "major depression" and panic disorder and started her on Prozac and Wellbutrin. (Tr. at 391-92.) A few weeks later he added that Plaintiff confirmed by phone that she was "off Wellbutrin." (*Id.*) Dr. Dumlao saw her next in March 2001. (Tr. at 398.) She claimed to feel fatigued, and continued to assert this in calls to Dr. Dumlao over the following months. (Tr. at 393, 398.)

In April, complaining of fatigue, she underwent blood tests and a thyroid ultrasound. (Tr. at 264, 273.) The radiologist's report describing the ultrasound noted that the blood tests were abnormal, but did not detail more. (Tr. at 264.) The ultrasound, however, returned normal. (*Id.*) Additional laboratory tests in April, June, and August appear in the record without specific medical commentary, although apparently a few elements in her blood were elevated and the report provides generalized descriptions of possible medical effects. (Tr. at 266-72, 274-82.)

Dr. Mark R. Villeneuve diagnosed Plaintiff with obstructive sleep apnea in June 2002. (Tr. at 286.) She continued to complain of fatigue into 2003, when she saw Dr. Jennifer Nastelin at the University of Michigan Hospital. (Tr. at 371.) She slept for eight to ten hours a night, waking two

or three times to use the restroom but "go[ing] back to sleep easily." (*Id.*) She remained tired in the mornings but did not sleep during the day or feel weak. (*Id.*) She smoked one pack of cigarettes a day for the past year, she stated. (*Id.*) The physical examination did not find any abnormalities. (Tr. at 371-72.) Dr. Nastelin also reviewed a 2002 polysomnogram that showed only "mild obstructive sleep apnea." (Tr. at 372.) Dr. Nastelin concurred with this assessment. (*Id.*) In May, a sleep study at the University of Michigan found Plaintiff had "[p]ossible sleep apnea." (Tr. at 370.)

She returned the next month for a comprehensive examination. (Tr. at 373.) Again, the findings were normal aside from discomfort in her pelvis. (*Id.*) Plaintiff also mentioned ongoing infertility treatments. (*Id.*) Dr. Nastelin assessed fatigue and depression, prescribing medications including Wellbutrin. (*Id.*) She explained that the fatigue related to her depression, "rather than some other underlying problem." (*Id.*) Finally, her thyroid appeared "completely normal" in tests and no additional studies were needed. (*Id.*)

Dr. Tamara Gay at the University of Michigan Hospital conducted a psychiatric evaluation of Plaintiff on April 27, 2004. (Tr. at 362-65.) In a letter to Dr. Nastelin, she recommended Plaintiff switch from Prozac to Celexa. (Tr. at 362.) Dr. Gay mentioned that Plaintiff had already begun taking a lower dose of Prozac on her own initiative and they would complete the transition after Plaintiff "returns from a cross country trip in a week . . . ." (*Id.*) Finally, Plaintiff wished to continue psychiatric treatment at the Hospital as well. (*Id.*)

During the evaluation, Plaintiff told Dr. Gay that her first panic attack struck when she was still a girl, after an intruder broke into her parents' home and sexually molested her. (Tr. at 363.) Testifying at the assailant's trial was "a very difficult process," and Dr. Gay discerned "symptoms

11

consistent with [post traumatic stress disorder] . . . ." (*Id.*) Plaintiff also discussed her medication history, stating that the initial Xanax prescription prevented panic attacks, but soon became less and less effective. (*Id.*) She tried Prozac and Effexor, which her husband thought helped but she decided to "self taper" to avoid becoming addicted. (*Id.*) Wellbutrin "never helped" and Zoloft turned her into a "zombie." (*Id.*) She claimed to have a current psychiatrist, "Dr. Novak," who gave her Ritalin; "She said it did help her get more work done, but it interfered with her sleep." (*Id.*) Dr. Gay surmised from "her comments that there have been many times that she has tried to take herself off meds since she is frustrated by having to be on medication." (*Id.*) The medicine now made her feel "bland," which she rated as a level four on a visual analog scale ("VA"). (*Id.*) Her energy level was at five on the same scale. (*Id.*) Other symptoms of either the depression or the medicine, she could not tell which, included oversleeping and overeating. (Tr. at 363-64.) She planned to diet to counteract the latter issue. (Tr. at 364.)

Plaintiff also discussed her psychiatric history, noting her current psychiatrist as well as past visits to Dr. Dumlao. (Tr. at 364.) Plaintiff "thought she had symptoms consistent with social anxiety" in the past, and still had "moderate avoidance and social phobia and significant performance anxiety." (*Id.*) Nonetheless, she denied "currently" experiencing any panic attacks and said she had never felt suicidal. (*Id.*) Transitioning to her social life, Plaintiff discussed her son and husband. (*Id.*) It took three years for her to conceive the first time, and now she was "actively engaged in fertility treatments to try to have a second child." (*Id.*) Explaining her medical history, Plaintiff stated that initial sleep studies indicated possible sleep apnea, but the University Hospital's recent study "ruled that out." (*Id.*) She received fertility treatments, medication for

endometriosis, and a drug for hypothyroidism. (*Id.*) Other records show attempts at artificial insemination in 2003 and 2004. (Tr. at 338.)

Dr. Gay began her assessment by noting Plaintiff was "neatly dressed and groomed . . . ." (*Id.*) Her affect oscillated "between euthymic and somewhat anxious." (Tr. at 365.) She remained goal-directed and her thought processes did not betray any disorders. (*Id.*) The diagnosis included recurrent major depression and "significant panic symptoms by history"; her "[c]urrent stressors" were infertility, endometriosis treatments, and her husband's unemployment. (*Id.*) Her Global Assessment of Functioning ("GAF") was fifty-five, indicating "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000) ("DSM-IV-TR"). Looking ahead to treatment options, Plaintiff expressed frustration with Prozac, so Dr. Gay recommended Celexa. (*Id.*) "She is not interested in psychotherapy," Dr. Gay added, "explaining that she 'does not believe in it.'" (*Id.*) But the changes would have to wait until Plaintiff returned from visiting her sister-in-law in California, who had breast cancer. (*Id.*)

In December 2004, Plaintiff went to the University Hospital complaining of back pain. (Tr. at 374, 378.) She told Dr. Lawrence McMaster that she remained "active by lifting weights." (*Id.*) She moved slowly during the examination but he could not uncover any abnormalities, or even tenderness in her back. (*Id.*) He assessed "back pain with radicular symptoms" and prescribed pain relievers. (*Id.*)

Plaintiff visited the University Hospital's sleep clinic on February 24, 2005, claiming chronic fatigue for the past six years. (Tr. at 375.) Dr. Douglas Kirsch described the evaluation to

Dr. Nastelin. Plaintiff again said she fell asleep without difficulty and denied "any excessive daytime sleepiness," but claimed to lack energy "and therefore it is hard to initiate an exercise program or other activities." (*Id.*) She rarely awoke with a panic attack, she stated. (*Id.*) Dr. Kirsch thought she appeared "well groomed" and observed no mental or physical issues upon examination. (Tr. at 376.) He planned additional studies and recommended changing her "current exercise program" where "she will intermittently exercise a large period of time." (Tr. at 377.) The sleep studies, conducted over the subsequent months, appear to indicate sleep issues, but the results are not clearly described. (Tr. at 366-69.)

Dr. Linda Balogh at University Hospital examined Plaintiff on October 31, 2006. (Tr. at 379.) Plaintiff claimed various illnesses, including chronic obstructive pulmonary disease ("COPD"), airway disease, and hyperlipidemia, among others. (*Id.*) After discussing her physical problems, Plaintiff stated she had "a sad and depressed mood" but "does not think her depression is a problem and she is currently well controlled on 100 mg of Zoloft and needs to have that refilled today." (*Id.*) Her smoking increased to one-and-a-half packs a day. (*Id.*) She also claimed she received "a new patent" and was "starting a business from her home . . . ." (*Id.*) The physical examination was unexceptional and Dr. Balogh observed, "She looks well." (*Id.*) The impression was fatigue and "history of sleep apnea." (*Id.*) She gave her an albuterol inhaler for the COPD and medicine for hypothyroidism. (Tr. at 380.)

The next set of notes from Dr. Balogh come from nearly a year later, on September 26, 2007. (Tr. at 306.) Plaintiff arrived with a cough, but also discussed her depression medication. (*Id.*) She requested a Zoloft refill because, while it did "not provide the energy that Prozac has," it "helps her more for anxiety than other medications . . . ." (*Id.*) Dr. Balogh concluded that

14

Plaintiff was "currently doing okay with Zoloft." (Tr. at 309.) Plaintiff continued to work on getting her patented product to market, she claimed. (Tr. at 308.)

In late February 2008, Plaintiff developed severe abdominal pain, eventually going to the emergency department. (Tr. at 297.) She was given pain pills and discharged, but returned the next day when the pain persisted. (*Id.*) Surgeons suspected appendicitis and operated. (Tr. at 287.) Plaintiff later told Dr. Balogh that they removed her appendix, left ovary, and fallopian tube. (Tr. at 306.) After the surgery, she developed an Escherichia coli infection. (Tr. at 289, 306.) Emergency room reports note that Plaintiff's medical history, presumably as told by Plaintiff, included endometriosis, ovarian cysts, panic attacks, and chronic fatigue syndrome. (Tr. at 291-92, 294, 297.) At two points, the main reports mention she appeared anxious. (Tr. at 292, 295.) When Plaintiff saw Dr. Balogh the next month, she reported no further abdominal pain and the notes state, "She looks very well." (Tr. at 306.)

One year later, in February 2009, Plaintiff returned to Dr. Balogh, telling her that she decided to discontinue Zoloft and Prozac, as she thought they caused weight gain. (Tr. at 304.) This did not present a problem because "[s]he does not think that she is having any trouble with depression." (*Id.*) And, in fact, Dr. Balogh did not mention depression or anxiety in her "Impression and Plan" list, and does not appear to have prescribed any medication for them. (*Id.*) Plaintiff did state, however, that she lacked motivation and could no longer afford her previous attention deficit disorder ("ADD") medication, which she thought had worked well. (*Id.*) Dr. Balogh gave her a substitute, Adderall XR. (*Id.*) Plaintiff also informed Dr. Balogh that she had divorced her husband. (*Id.*) In May, Plaintiff reported the return of her anxiety and depression, but she did not want to use Zoloft due to possible weight gain; Dr. Balogh acknowledged she looked

"anxious, but well," and prescribed Celexa. (Tr. at 302-03.) Plaintiff had also stopped taking Adderall and requested a switch to a generic brand. (*Id.*) Dr. Balogh noted cryptically, "She works online . . . ." (Tr. at 302.)

In June 2009, Plaintiff told Dr. Balogh that Celexa "made her feel more irritable" and she asked for Prozac, which she claimed worked "well . . . in the past." (Tr. at 300.) The panic attacks had returned as well, and Dr. Balogh reported, "I think she had a panic attack in our waiting room today, as out there she felt shaky, nervous, weak. No shortness of breath or chest pain." (*Id.*) She remained unconvinced of the merits of psychotherapy. (*Id.*) The physical examination was normal. (*Id.*)

Dr. Henry Woodworth, a psychiatrist, examined Plaintiff on November 5, 2009. (Tr. at 322, 351.) He wrote that the problems prompting the visit were a agoraphobia, panic attacks, ADHD, and lack of motivation. (*Id.*) She ran down the list of medications tried and rejected. (*Id.*) She had recently gone back on Prozac, which she reported "helped some." (Tr. at 324.) Later, she said that Xanax "helped" as well. (Tr. at 328.) Her general health was "good." (Tr. at 315, 322.) She excelled at college, she said, earning Dean's List honors but struggling with social aspects. (Tr. at 324.) They discussed her panic attacks and the disorder's origins in her molestation. (Tr. at 326-28.)

Plaintiff next saw Dr. Woodworth on January 26, 2011, accompanied by her older sister. (Tr. at 313.) She explained that she did not return sooner because she could not afford it, and that he was the last psychiatrist she saw. (*Id.*) The reason for the visit was depression, ADHD, and "Panic Attacks/Social phobia." (*Id.*) Also, she noted fatigue in the mornings and "[t]errible" concentration and obsessiveness. (*Id.*) She was still taking Prozac, and also told the psychiatrist

16

that she "felt really good" on Vyvanse, which he then prescribed along with Xanax and Inderal. (*Id.*) Home Depot had offered her a job, she said, causing her to panic about "public situation[s]." (Tr. at 314.) Dr. Woodworth jotted, "PTSD (no flashbacks)," in the middle of the notes. (Tr. at 315.)

On the same date, Dr. Woodworth drafted a letter for Plaintiff. (Tr. at 312.) He stated the reasons Plaintiff began seeing him: "[S]evere panic attacks, anxiety, depression[,] and problems with focus/concentration." (*Id.*) "After a complete evaluation" in November 2009, he continued, "she was diagnosed with a Posttraumatic Stress Disorder, a Panic Disorder, and an Attention Deficit Disorder." (*Id.*) She delayed her "follow-up" appointment until "today" only because of financial troubles, which state assistance had recently resolved. (*Id.*) Consequently, she would be seeing him "on a regular basis." (*Id.*) He concluded, "[I]t is my opinion that Ms. Hollis is unable to seek employment or work in any capacity." (*Id.*)

Plaintiff saw Dr. Balogh on January 31, 2011, mentioning her depression and anxiety. (Tr. at 344.) She reported that a psychiatrist was planning to prescribe Wellbutrin, and added that the Vyvanse she just started taking was "helping her feel more calm about being able to think more clearly," though she skipped doses to avoid the insomnia side effects. (*Id.*) She remained "confident that [the psychiatrist] will help her." (*Id.*) Her fatigue, she now admitted, could relate to her anxiety and depression. (*Id.*) She reported working at her sister's salon and looking for a position at Home Depot. (*Id.*)

In February, Plaintiff met with Dr. Terrance Mills, Ph.D., who provided a consultative examination for the state agency handling disability benefits. (Tr. at 333-35.) In the "Complaints and Symptoms" section of his report, he wrote that "[s]he has PTSD" after an intruder raped her

when she was nineteen. (Tr. at 333.) Plaintiff also reported recurrent flashbacks, and also panic attacks, which occurred in public, particularly in stores. (Tr. at 333.) She also added to her educational history, recalling that she attended special education classes in grade school before going to college. (*Id.*) She never adjusted to public situations, either in school or the workplace. (*Id.*) A few weeks prior, for example, her sister arranged a job for her at Home Depot, but she lasted only three days, leaving after experiencing "a dizzy spell and a panic attack." (*Id.*) She lived with her sister, who also brought her to the clinic. (*Id.*) Aside from her sisters, she lacked any social contacts, and neither attended social events nor drove. (Tr. at 333-34.) During a typical day, she woke her son before school, packed his lunch, and helped with his homework. (Tr. at 334.) She could also cook simple meals, but frequently needed reminders to tidy her hair and, her sister added, she was "not good with money . . . ." (*Id.*)

Dr. Mills observed that Plaintiff "appeared neatly dressed," with normal posture and gait, yet had poor eye contact and unkempt hair. (*Id.*) She spoke logically and spontaneously and denied suicidal thoughts. (*Id.*) She cried intermittently throughout the session, and she seemed sad and depressed. (*Id.*) Dr. Mills diagnosed PTSD, panic disorder with agoraphobia, and ADHD; her GAF score was forty-five, (Tr. at 335), indicating "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Am. Psychiatric Ass'n, *supra* at 34. Her prognosis was fair, but he concluded that she was "unable to do work related activities. . . . She is barely able to care for herself." (Tr. at 335.) He ended by stating the conclusion derived from "the disclosed and observed conditions and impairments of the Claimant." (*Id.*)

Dr. Kathy Morrow, Ph.D., reviewed Plaintiff's medical records in March 2001. (Tr. at 44, 56.) She noted that Plaintiff could drive, leave the house alone, and shop. (*Id.*) Also, she highlighted the absence of any psychological treatment notes. (*Id.*) Thus, she determined that Plaintiff could independently perform certain tasks and could "tolerate low stress social demands and adapt to simple changes in routine." (*Id.*)

### 2.    Application Forms and Administrative Hearing

Plaintiff's sister completed a Function Report on Plaintiff's behalf. (Tr. at 205-12.) In it, Plaintiff claimed disability because she was afraid to leave her house, she had panic attacks, she was "not social," and her attention span and memory were "bad." (Tr. at 205.) During the day she woke her son, prepared him for school, helped him with homework, and tried "to find at home work jobs" on the computer. (Tr. at 206.) Her sister helped during the day. (*Id.*) She had no problems with personal care, the report states, but needed reminders to pay bills and take medicine. (Tr. at 207.) The meals she made consisted of simple foods. (*Id.*) She could also do light household chores, such as laundry, dishes, and vacuuming. (*Id.*) She sometimes drove, and could shop at stores, but usually took her sister along. (Tr. at 208.) She could pay bills, count change, and handle a savings account, but could not use a checkbook or money orders. (*Id.*) Her interests included watching television and reading, though she struggled to concentrate sometimes. (Tr. at 209.) She did not participate in any social activities, needed reminders "to go places," and needed someone to accompany her. (*Id.*) In the section listing various limitations imposed by her illnesses, she selected none of the physical restrictions but all of the mental ones, such as memory, understanding, and getting along with others. (Tr. at 210.) She found instructions confusing, but could get along with authority figures "ok" and had never been fired due to interpersonal issues.

(Tr. at 210-11.) Her sister also filled out a third-party Function Report that largely mirrors Plaintiff's. (Tr. at 192-97.)

Plaintiff appeared at an administrative hearing before ALJ Martha Gasparovich on January 31, 2012. (Tr. at 8-32.) She testified that, after living with her sister, she had now moved back to her ex-husband's. (Tr. at 13.) Her last job at Home Depot ended after "two or three days" because, on what ended up being her last shift, she felt panic attack symptoms "coming on," including dizziness and nausea. (Tr. at 14-15.) She left the store, phoned her boss, and quit. (*Id.*) She tried online marketing but could not stay focused, she claimed. (Tr. at 15.)

Her attorney then asked her why she stopped working in 1996. (Tr. at 16.) "All of a sudden my panic attacks started getting really bad," she replied. (*Id.*) Attending company meetings became impossible and she could have panic attacks even when sitting at her desk. (*Id.*) The panic episodes felt like a heart attack, like she was "dying." (Tr. at 17.) And they occurred "probably every day, but mostly if I'm around people or I try to leave the house," she explained. (Tr. at 18.) For instance, she experienced them at gas stations or when she tried to attend one of her son's basketball games. (Tr. at 18-19.) She had to leave a grocery store once, she recalled, due to a panic attack. (Tr. at 17.) Medications helped, but not consistently. (Tr. at 17-18.) At times, she drifted into mental fugues, staring at nothing for up to twenty minutes. (Tr. at 20-21.) Her lack of concentration disrupted her vocational aspirations: "I wanted so badly to work out of my home. I want it so badly. And I tried and I tried. I'd be on one thing, and I couldn't stay on it long enough." (Tr. at 21.) She added that she still had flashbacks to her molestation "all the time." (Tr. at 23.) Also, she sometimes had difficulty remembering to give her son his medication. (*Id.*) But her ex-husband "was not helping [her] at all with anything[.]" (Tr. at 24.)

20

The ALJ then asked the vocational expert ("VE") the following hypothetical:

> I'd like you to assume an individual who's . . . 48 years old, and possesses the same educational background and work experience as Ms. Hollis. Assume the individual is limited to simple, routine, one to three step tasks in a low stress environment defined as no quick-decision-making, and no quick judgment on the job. There could be no interaction with the public, and only occasional interaction with coworkers. And all work must be performed in a nonproduction[-]pace setting. Are there any jobs that exist in the national economy such an individual could perform?

(Tr. at 27-28.) "There would be jobs at various exertional levels," the VE responded, including as a hospital housekeeper (4000 positions in the Detroit, Michigan area; 10,000 in the state); a night cleaner (4000 in the Detroit area; 15,000 in the state); and an inspector (2500 in the Detroit area; 5000 in the state). (Tr. at 28.) The first two were medium-exertion level positions, the last was sedentary. (*Id.*) The individual could still perform the last two positions with the following additional restrictions: "stand and walk no more than six hours in an eight hour day, was limited to lifting no more than 20 pounds occasionally and 10 pounds frequently . . . ." (Tr. at 28-29.) If the first hypothetical individual strayed off task up to one-third of the workday, she would not be able to function in any position. (Tr. at 29.) Likewise if the individual needed at least one, thirty to forty-five minute unscheduled break during the day. (*Id.*) A person could have up to two absences per month, including days he or she left during the shift; any more would preclude employment. (Tr. at 30-31.)

### F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she had the RFC

to perform a full range of work at all exertional levels but with the following non-exertional limitations: limited to simple and routine tasks with one, two, or three-step tasks; limited to a low-stress work environment, defined as requiring no quick decision-making and no quick judgment on the job; no interaction with the public;

limited to occasional interaction with co-workers; and limited to working in a non-production pace setting.

(Tr. at 67.) After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2. **Substantial Evidence**

Plaintiff levies three arguments against the ALJ's decision. (Doc. 17 at 11-21.) First, she claims that the ALJ failed to give enough weight to Dr. Mills's and Dr. Woodworth's opinions. (*Id.* at 11-18.) She asserts that, contrary to the ALJ, Dr. Mills did not rely solely upon subjective complaints and his opinion was consistent with record evidence and another medical opinion. (*Id.* at 11-14.) The record also supported Dr. Woodworth's opinion, she continues, adding that he examined her twice while the non-examining state consultant whom the ALJ credited only reviewed the records. (*Id.* at 15-16.) Plaintiff also contends that if the ALJ could not decipher Dr. Woodworth's scrawl, the ALJ had to recontact him for clarification. (*Id.* at 16.) She adds that "Dr. Woodworth should be considered a treating source." (*Id.* at 16-17.) She next claims that the ALJ's credibility analysis failed to consider the medications' side effects; over-emphasized Plaintiff's trip to California, attempts to become pregnant, and her daily activities; and used boilerplate language suggesting the ALJ botched the analysis. (*Id.* t 18-20.)

I will address Plaintiff's final count here because it does not develop a substantial independent argument. (*Id.* at 20-21.) She concludes that the ALJ's "Step 5 determination is unsupported by substantial evidence because the ALJ asked the vocational expert an incomplete hypothetical question." (*Id.* at 20.) As an initial matter, the hypothetical the ALJ asked the VE matches the decision's RFC, (Tr. at 27-28, 65), so the ALJ properly relied on the testimony if the

hypothetical and RFC were sound. But that does not appear to be Plaintiff's point. After citing case law, Plaintiff encapsulates her entire analysis in a single sentence: "Here, the ALJ's errors in assessing Plaintiff's credibility, RFC, and failure to develop the record with respect to Dr. Woodworth's opinion render the hypothetical question asked to the VE incomplete." (Doc. 17 at 21.) Thus, because the RFC and hypothetical were inaccurate, the elicited testimony cannot support the decision. (*Id.*) The third contention is only valid if the first two show that the RFC was mishandled. That is, the first two claims subsume the third. Therefore, this claim hinges on the success of the other arguments and those are where this report focuses.

### a.      Medical Sources, Plaintiff's Credibility, and the RFC

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513, 416.913. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and

physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527, 416.927. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. §§ 404.1527(c), 416.927(c), and the ALJ should use the same analysis for "other source" opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. The test looks at whether the source examined the claimant,  "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. §§ 404.1527(c), 416.927(c).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance

24

to the source of an opinion[, including treating sources],” regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual’s RFC, and the application of vocational factors. *Id.* §§ 404.1527(d)(3), 416.927(d)(3).

Additionally, a physician’s “notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the ‘opposite of objective medical evidence.’ . . . An ALJ is not required to accept the statement as true or to accept as true a physician’s opinion based on those assertions.” *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)). “Otherwise, the hearing would be a useless exercise.” *Id. See also Francis v. Comm’r of Soc. Sec.*, 414 F. App’x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in “Dr. Kllefer’s pain-related statement . . . [because] it merely regurgitates Francis’s self-described symptoms”); *Poe v. Comm’r of Soc. Sec.*, 342 F. App’x 149, 156 (6th Cir. 2009) (“[S]ubstantial evidence supports the ALJ’s determination that the opinion of Dr. Boyd, Poe’s treating physician, was not entitled to deference because it was based on Poe’s subjective complaints, rather than objective medical data.”).

The regulations mandate that the ALJ provide “good reasons” for the weight assigned to the treating source’s opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). *See also Smith v. Comm’r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source’s medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source’s opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ can properly reject a treating source opinion if it lacks supporting objective evidence. *Revels*

25

*v. Sec. of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792, at *4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity

26

of the pain. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. §§ 404.1528(a)., 416.928(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. §§ 404.1527(c), 416.927(c); SSR 96-7p, 1996 WL 374186, at *5.

27

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The claimant must provide evidence establishing the RFC. "An individual shall not be considered to be under a disability unless [she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [she] can still do despite [the] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). The Plaintiff bears the burden of proof during the first four stages of analysis. *Jones*, 336 F.3d at 474. In the first four steps, the claimant must prove her RFC. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). At step five, the Commissioner does not have to add anything to the RFC. 20 C.F.R. §§ 404.1560(c), 416.960(c); *see also Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 538 (6th Cir. 2002); *DeVoll v. Comm'r of Soc. Sec.*, 234 F.3d 1267, 2000 WL 1529803, at *3 (6th Cir. 2000) (unpublished table decision); *Her*, 203 F.3d at 391-92. The VE's response to the ALJ's

28

hypothetical constitutes valid evidence if the hypothetical includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

### b.    Analysis

I address the ALJ's credibility analysis first, as it undergirded her view of the medical source opinions. The ALJ makes a few puzzling factual assertions and fails to cite appropriate accompanying evidence. She stated that Plaintiff took "numerous" vacations, though she cites only two: a 2004 trip to California and another planned excursion in 2011. (Tr. at 65-66.) Calling Plaintiff's 2004 travels a "vacation" stretches credulity, as Plaintiff went to visit her sick sister-in-law, who was battling cancer. (Tr. at 365.) The second trip, supposedly planned for 2011, appears nowhere in record, especially not where the ALJ cited: the 2004 report discussing the California trip that year. (Tr. at 362, 365.) The ALJ also mischaracterized Plaintiff's position at Home Depot, saying she worked there "on a part-time basis for two to three days per week," though the ALJ admits she quit due to her panic symptoms. (Tr. at 64.) Plaintiff worked at Home Depot for two or three days total, not, as the ALJ implies, each week. (Tr. at 333.) Plaintiff informed Dr. Mills that her job lasted for three days, she testified to the same effect at the hearing, and her wage report displays meager earnings, $121.00, consistent with her testimony. (Tr. at 14-15, 155, 333.)

The ALJ also placed undue emphasis on Plaintiff's daily activities. (Tr. at 65.) "It is well recognized that a claimant's ability to perform limited and sporadic tasks does not mean she is capable of full-time employment." *Barker-Bair v. Comm'r of Soc. Sec.*, No. 1:06-CV-00696, 2008 WL 926569, at *11 (S.D. Ohio Apr. 3, 2008). Indeed, the list of activities the ALJ presents were

similar to the list in *Kalmbach v. Commissioner of Social Security*, which the Sixth Circuit thought was "hardly consistent with eight hours' worth of typical work activities." 409 F. App'x 852, 864 (6th Cir. 2011) ("Kalmbach indeed testified that she went to the grocery store, the pharmacy, and church, and that she was able to prepare her own meals most of the time, and usually able to dress herself without assistance. She was able to drive, but had to limit it to less than thirty minutes per day."); *see also Rogers*, 486 F.3d at 248-49 (noting that caring for animals, cleaning, driving, reading, and stretching were "not comparable to typical work activities").

The ALJ found only mild restrictions in her daily life because Plaintiff could clean, shop, cook simple meals, handle personal care, pay bills, and "get her son ready for school . . . ." (Tr. at 65.) As an initial matter, this glosses over contrary evidence. Plaintiff's cleaning consisted of light activities, such as laundry, dish washing, and vacuuming. (Tr. at 207.) *Cf. Rogers*, 486 F.3d at 248-49 (characterizing similar activities as "light housekeeping"). She could drive and shop, she admitted in her function report, but only "sometimes," and when she did, she usually went with her sisters. (Tr. at 208.) Plaintiff testified about specific examples of when she had to leave stores, her son's sporting events, and work due to panic attacks. (Tr. at 14-15, 17-19.) The ALJ also questioned the extent of her concentration issues because "claimant's sister reported the claimant watches television, again requiring a certain degree of focus." (Tr. at 65-66.) This ignored that Plaintiff wrote that concentrating on television was sometimes difficult. (Tr. at 209.) In any case, this is insubstantial evidence to use to discredit Plaintiff, particularly when the ALJ cites only one other piece of evidence–a comment that Vyvanse helped her concentration but she could no longer afford it, (Tr. at 304)–to find that Plaintiff's problems in this areas are merely "moderate." (Tr. at 65.) Thus, even if this list sufficed to show she could work, the list does not reflect the full record.

30

Her ability to "get her son ready for school" provides weak evidence to support the decision, as does the ALJ's references to Plaintiff's attempt to have another child. (Tr. at 69-70.) A few courts have noted a claimant's ability to raise a young child as one piece in a chain of evidence contradicting disability. *Temples v. Astrue*, No. 1:11CV-00090-JHM, 2012 WL 590814, at *5-7 (W.D. Ky. Jan. 24, 2012); *Andersen v. Astrue*, No. 3:11-cv-250-JAG, 2012 WL 4498921, *7, 14-16 (E.D. Va. June 15, 2012). Yet courts should be wary of "unpersuasive attempts to turn the fact that the plaintiff is the mother of . . . children, whom she chose not to abandon, into bases for disbelieving her testimony." *Dennis v. Astrue*, 655 F. Supp. 2d 746, 756 (W.D. Ky. 2009). And mere prospective motherhood entails no work that could undercut Plaintiff's assertions. In a similar context, where the plaintiff attended school while allegedly disabled, the Sixth Circuit lauded her "courage and determination in refusing to surrender to the debilitating effects of her illness." *Coehn v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 530 (6th Cir. 1992). Likewise here, Plaintiff's devotion to her son and desire to expand her family should not be taken to diminish her subjective complaints.

The ALJ's analysis of Plaintiff's work attempts is also inadequate to support her analysis. The ALJ must consider "[e]vidence from attempts to work . . . ." SSR 96-8p, 1996 WL 374184, at *5. Acknowledging that none of her attempts represented substantial gainful activity, the ALJ nonetheless thought that Plaintiff's work at her sister's salon, online work, and employment at Home Depot diminished her credibility. (Tr. at 70.) As noted, the work at Home Depot is much less substantial than the ALJ implied. Moreover the extent of her position at her sister's salon is unknown. (Tr. at 344.) Plaintiff made a stray comment to Dr. Balogh in January 2011 that she was "currently not working other than for her sister's salon . . . ." (Tr. at 344.) The ALJ interpreted this

31

to mean that her daily activities were, at least at times, greater than she let on and that the position "required a certain degree of social interaction." (Tr. at 65, 70.) Certainly, her daily life may have been more active during this period; but there is no evidence demonstrating the length of her employment or that she had any interaction with outsiders. The ALJ makes inferences not clearly borne by the record. Similarly, the ALJ ignores Plaintiff's testimony that she stopped her online marketing work because she could not remain focused. (Tr. at 15.) These failed attempts to work are given disproportionate importance in the findings and the ALJ failed to explain why they support her conclusion rather than show Plaintiff's inability to sustain work. *Cf. Clardy v. Barnhart*, No. 03-2347, 2004 WL 737486, at *5 & n.3 (D. Kan. Apr. 5, 2004) (remanding so the ALJ could consider the "plaintiff's inability to sustain work activity when she went back to work in 1999," which the plaintiff argued showed that she could not work).

But the ALJ's errors cut both ways, for she also passed over evidence that Plaintiff obtained a patent and tried to launch a business. In 2006 and again in 2007, Plaintiff informed Dr. Balogh that she had a patented product she hoped to bring to market. (Tr. at 308, 379.) This may have been the online marketing work Plaintiff testified about and the ALJ cited. In any case, the Court notes that evidence Plaintiff obtained a patent during a period in which she claimed to be disabled would appear to be highly probative. The ALJ failed to discuss this and, given that other errors pervade the credibility analysis, the Court cannot write off the oversight as harmless. The Court also observes that a patent application for a message delivery system was filed in September 2002 under the name "Michelle M. Hollis" from Canton, Michigan and granted in May 2006. U.S. Patent No. 7,051,559 (filed Sept. 3, 2002). The Court can take judicial notice of the patent. Judicial notice applies in Social Security cases. *See Doran v. Schweiker*, 681 F.2d 605, 609 (9th Cir. 1982)

32

(taking judicial notice of facts); *McKentry v. Sec'y of Health & Human Servs.*, 655 F.2d 721, 724 (6th Cir. 1981) (same). Patents and patent applications are public records "subject to judicial notice." *Carlucci v. Han*, 886 F. Supp. 2d 497, 521 (E.D. Va. 2012); *see also Johnson v. Apple, Inc.*, No. 3:13-cv-204, 2014 WL 4076148, at * (S.D. Ohio Aug. 14, 2014) (Report & Recommendation) ("The Court takes judicial notice that Johnson's patent application is under final rejection." (citing *Mettke v. Hewlett Packard Co.*, No. 2:11-CV-00410, 2012 WL 1158629, at *3 n.2 (S.D. Ohio Apr. 6, 2012) (taking judicial notice of patent application on government website))).

The ALJ similarly relied too heavily upon treatment gaps in the record. The ALJ noted that there was a "significant treatment gap" from 2000 until 2004, (Tr. at 68), and later added that this displayed inconsistent treatment. (Tr. at 69.) The ALJ likewise noted that Plaintiff declined counseling, inferring that "[i]f her symptoms were truly debilitating, one would expect the claimant to pursue alternate treatment methods if medication did not regulate her symptoms." (*Id.*) Some of those gaps, such as the one during 2010, occurred because Plaintiff lacked funds, she claimed. (Tr. at 312.) The ALJ did not address this contention. During another "gap," Plaintiff sought treatment for chronic fatigue, (Tr. at 375), which she associated with her depression. (Tr. at 344, 373.) The ALJ also mentioned that Plaintiff found the medications effective on a few occasions. (*Id.*) Yet, even when Plaintiff was satisfied with the medication, she stated that her mood was "sad and depressed . . . ." (Tr. at 379.) Moreover, Plaintiff consistently switched medications throughout her record because she remained unhappy with their results. (Tr. at 300, 322, 324, 304, 363, 382, 384-85, 395-96.) She never settled on a mix of medications that sufficiently reduced her symptoms.

Nevertheless, a body of case law cautions ALJs against reading too much into non-compliance with treatment. *See Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011) ("[P]eople with serious psychiatric problems are often incapable of taking their prescribed medications consistently."); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) ("For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself."); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) ("Here, although the ALJ drew a negative inference as to Craft's credibility from his lack of medical care, she neither questioned him about his lack of treatment . . . nor did she note [his] . . . inability to pay . . . .").[4] As the Sixth Circuit noted, "a claimant's failure to seek mental health treatment is not probative of whether a mental impairment exists and should not be determinative in a credibility assessment." *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 436 (6th Cir. 2013). The ALJ failed to acknowledge this law, instead citing Plaintiff's non-compliance without qualification throughout her decision.

The flaws in the credibility analysis also infect the ALJ's treatment of the medical source opinions. Her entire explicit rationale for giving Dr. Mills's opinion "little weight" was that "it is heavily based on the claimant's self-report of her symptoms, which are simply not supported in the

---

[4] Indeed, studies consistently show that depressed individuals are less likely than the non-depressed to adhere to prescriptions, though the research includes the normal hedge that the results show correlation rather than causation. That is, the studies do not show depression causes the noncompliance. *See* Jerry L. Grenard, et al., *Depression and Medication Adherence in the Treatment of Chronic Diseases in the United States*, 26 J. Gen. Internal Med. 1175, 1178 (2011) ("The estimated odds of a depressed patient being non-adherent are 1.76 times that of the odds of a non-depressed patient . . . ."); Lars Osterber & Terrence Blaschke, *Adherence to Medication*, 353 New Eng. J. Med. 487, 493 (2005) ("Patients with psychiatric illness typically have great difficulty following a medication regimen . . . ."); Kathryn K. Bucci, et al., *Strategies to Improve Medication Adherence in Patients With Depression*, 60 Am. J. Health-System Pharmacy 2601, 2601 (2003) (noting studies showing higher noncompliance rates among depressed populations); S. Pampallona, et al., *Patient Adherence in the Treatment of Depression*, 180 Brit. J. of Psychiatry 104, 106 (2002) ("[A]dherence is a major problem in the treatment of depression. . . . [E]vidence from descriptive epidemiological studies confirmed that about one in three patients could not complete treatment."); M. Robin DiMatteo, et al., *Depression is a Risk Factor for Noncompliance With Medical Treatment*, 160 Archives Internal Med. 2101, 2105 (2000) ("[D]epressed patients were 3 times as likely as nondepressed patients to be noncompliant.").

clinical record." (Tr. at 69.) This errs on two levels. First, as noted above, the ALJ mishandled the credibility analysis; thus, basing her rejection of Dr. Mills's opinion on her rejection of Plaintiff's credibility merely compounds the problem. Second, Dr. Mills appears to have relied upon more than Plaintiff's complaints. He noted her appearance, assessed her speaking and thought processes, observed that she cried throughout the session and seemed depressed, and assessed a GAF score. (Tr. at 334-35.) The session and notes included a "sensorium and mental capacity" examination and utilized the multiaxial assessment set out in the DSM-IV-TR. (Tr. at 335.) The multiaxial assessment "facilitates comprehensive and systematic evaluation" and "communicat[es] clinical information . . . ." Am. Psychiatric Ass'n, *supra* at 27.

Anxiety and depression diagnoses appear to rely heavily upon what the claimant says and how he or she appears. Dr. Mills, a psychologist, is trained to make his assessments on those bases. One court has noted the difficulties of classifying objective evidence in this area: "'[P]sychiatric impairment is not as readily amenable to substantiation by objective laboratory testing,'" thus "'[w]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of diagnoses and observations of professionals trained in the field of psychopathology.'" *Sanchez v. Apfel*, 85 F. Supp. 2d 986, 992 (C.D. Cal. 2000) (quoting *Christensen v. Bowen*, 633 F.Supp. 1214, 1220–21 (N.D.Cal.1986)); *cf. Russell v. Astrue*, No. 1:09-cv-01919, 2011 WL 1595982, at *15 (E.D. Cal. Apr. 27, 2011) (noting that the treatment notes did not "document any objective evidence of depression or anxiety, such as administration of any psychological tests, or even observations of Plaintiff's demeanor"). Dr. Mills's notes adequately convey the clinical observations and examinations underlying his diagnoses and conclusions. The ALJ does not state why she believes these more objective measures fail to support those conclusions. Nor does she

explicitly address the other regulatory factors in 20 C.F.R. §§ 404.1527(c), 416.927(c). Dr. Mills opinion was consistent with the only other examining medical opinion in the record, Dr. Woodworth's; but given her errors, the ALJ fails to explain sufficiently why these two examiners erred where the non-examiner, Dr. Morrow, came to the correct conclusion.

The ALJ's analysis of Dr. Woodworth's opinion was likewise unacceptable. However, the ALJ did not err in declining to characterize him as a treating source. "Acceptable medical sources" qualify as treating sources only if they are "licensed physicians" or "licensed or certified psychologists." 20 C.F.R. §§ 404.1513(a)(1)-(2), 416.913(a)(1)-(2). *See also* SSR 06-03p, 2006 WL 2329939, at *1-2 (2006). Additionally, to become a treating source, the relationship between the physician and claimant must have been "ongoing." 20 C.F.R. §§ 404.1502, 416.902. That is, treatments or evaluations must have occurred "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition(s)." *Id.* Infrequent consultations or a brief period of treatment often preclude a source from this category. *See, e.g.*, *Smith*, 482 F.3d at 876 (finding that two physicians who each treated claimant once were not treating sources).

In the Sixth Circuit, "more than one examination is required to attain treating-physician status." *Pethers v. Comm'r of Soc. Sec.*, 580 F. Supp. 2d 572, 579 n.16 (W.D. Mich. 2008). *See also Hoskins v. Comm'r of Soc. Sec.*, 106 F. App'x 412, 414-15 (6th Cir. 2004) (treating a claimant only once is insufficient for treating status); *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (same); *Atterberry v. Sec. of Health & Human Servs.*, 871 F.2d 567, 571 (6th Cir. 1989) (same). Moreover, "depending on the circumstances and nature of the alleged condition, two to three visits often will not suffice for an ongoing treatment relationship." *Kornecky*, 167 F. App'x at 506. *See*

36

*also Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 n.3 (6th Circ. 2011) ("[I]t is questionable whether a physician who examines a patient only three times over a four-month period is a treating source."). Thus, for example, the Sixth Circuit found that two visits within one month were insufficient in *Daniels v. Commissioner of Social Security* because it did not show "a frequency consistent with the treatment of back pain, as evidenced by the fact that he received treatment from other sources on many other occasions." 152 F. App'x 485, 491 (6th Cir. 2005).

Only in unusual circumstances will two visits be enough to establish an "ongoing treatment relationship." Plaintiff cites *Kerkau v. Commissioner of Social Security* for the proposition that two appointments can suffice, (Doc. 17 at 16-17); and indeed that case found that the two visits on the record created such a relationship. No. 12-11520, 2013 WL 2947472, at *9 (E.D. Mich. June 14, 2013). However, that case contained a sizeable pile of facts supporting the conclusion which is absent here. Both parties there assumed he was a treating source. *Id.* at *8. The two visits were only a few weeks apart. *Id.* Additionally, the record indicated the physician might have examined the plaintiff more than twice–the plaintiff recalled an earlier visit and even "identified him as her primary care physician" before the first recorded visit. *Id.* The signature on other records was illegible, obscuring whether the physician treated her on those occasions as well. *Id.* at *9. Even assuming just two visits, the court stated, the evidence showed the physician monitored the plaintiff's progress, the plaintiff viewed him as her doctor, the visits were frequent within the brief period, he was referenced as her doctor in other forms, and other physicians sent him letters detailing her progress. *Id.* at *9. The court suggested that even though a treating source, his opinion was likely not controlling and "due less weight . . . ." *Id.*

Here, more than a year separated Plaintiff's only two visits to Dr. Woodworth in the record. (Tr. at 313, 322.) Her explanation for the gap–financial difficulties–is perhaps understandable but does not provide evidence showing a treating relationship. (Tr. at 313.) Though the sessions seemed thorough, discussing her past and her medications, they do not represent the sort of consistent monitoring the regulations envision. For example, he did not prescribe any medications on the first visit, suggesting they did not anticipate an ongoing relationship. Moreover, as in *Daniels*, Plaintiff received "treatment from other sources on many other occasions." 152 F. App'x at 491. Dr. Woodworth's letter promised "regular" visits in the future, (Tr. at 312), yet none appear in the record despite the year-long gap between that letter and the hearing. (Tr. at 8.) And at the hearing, the ALJ granted Plaintiff's counsel's request to keep the record open to submit additional records. (Tr. at 12-13.) Plaintiff's "Recent Medical Treatment Form," submitted on October 13, 2011, claims she saw Dr. Woodworth one more time, on September 7, 2011. (Tr. at 220.) And she told Dr. Balogh in January 2011 that she was seeing him. (Tr. at 344.) But, despite the open record, Plaintiff never submitted any other notes from him or otherwise verified that she continued seeing him. She never clearly referred to him as her primary psychiatrist, and he was not referenced in any other medical reports. *Cf. Kerkau*, 2013 WL 2947472, at *8-9. He was simply not a treating physician.

Dr. Woodworth's non-treating status released the ALJ from the regulatory requirement that she provide "good reasons" for the weight she assigned to his opinion. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). It did not, of course, absolve her from the supplying any analysis; she remained obligated to weigh the opinion under the regulatory factors listed in 20 C.F.R. §§ 404.1527(c), 416.927(c). *See also Wilson*, 378 F.3d at 544. She failed to fulfill this duty. The ALJ

declined to give Dr. Woodworth's opinion "any weight" for three reasons: (1) the "opinion was based heavily . . . on subjective complaints"; (2) the two meetings "were performed more than a year apart"; and (3) the issue he opined upon was "reserved to the Commission . . . ." (Tr. at 68.)

Her brief analysis has more traction here than with Dr. Mills's opinion, but still falls short. Again, the ALJ's faulty credibility analysis undercuts her first explanation. The illegibility of the notes obscures whether Dr. Woodworth employed specific clinical tests or made diagnostic observations. However, his letter stated that he conducted a "complete evaluation" and the ALJ gave no reason to think otherwise. (Tr. at 331.) Indeed, the notes appear to have addressed Plaintiff's medications, general physical health, her medical history, and her psychological history. (Tr. at 313-29.) Her sister also attended the second session, giving Dr. Woodworth additional perspective on Plaintiff's struggles. Moreover, his opinion was consistent with Dr. Mills's, and also the numerous psychiatrists and physicians who diagnosed depression and anxiety. (Tr. at 285, 302-03, 365, 379, 385, 391-92.) The two meetings Plaintiff had with Dr. Woodworth represent a small number, and the ALJ can take note of this. 20 C.F.R. §§ 404.1527(c), 416.927(c). However, the number exceeds Dr. Mills's lone consultation, to which the ALJ gave at least some weight, and Dr. Marrow, who did not examine Plaintiff at all. Why his number of meetings are a larger mark against his opinion than the other sources, with fewer or no examinations, the ALJ never explained. Additionally, while the ultimate disability determination is left to the Commissioner, Dr. Woodworth's opinion includes details, admittedly brief, giving insights into her limitations rather than baldly asserting her disability. (Tr. at 312.) The letter mentioned and confirmed her panic attacks, depression, and problems focusing. (*Id.*) Though it did not quantify or measure the restrictions these impose, it suggested they are severe. The ALJ might have justifiably disregarded

39

the conclusion that Plaintiff cannot work–which rests with the Commissioner and necessarily entails vocational considerations Dr. Woodworth was not qualified to make–but the ALJ could not ignore that Dr. Woodworth intended to diagnose severe limitations flowing from Plaintiff's impairments.

In contrast, the ALJ gave "significant weight" to Dr. Morrow's opinion. (Tr. at 70.) Yet, her explanation fails to persuade. The ALJ highlighted the fact that, "as a state agency consultant, Dr. Morrow has specialized knowledge about the proper application of Social Security Rules and Regulations." (*Id.*) Yet, Dr. Mills served as a consultant as well, but was not credited with any special insights as a result. The assertion that Dr. Morrow's opinion was consistent with the objective and clinical evidence is odd, considering that the only other clinical evaluations commenting on her limitations found Plaintiff incapable of work, while other physicians and psychiatrists consistently diagnosed depression. (Tr. at 285, 302-03, 322-26, 334-35, 365, 379, 385, 391-92.) And, as Plaintiff points out, (Reply, Doc. 20 at 3), Dr. Morrow's report stated that there was not other "medical source and/or other source opinions about the individual's limitations or restrictions which [were] more restrictive than" hers. (Tr. at 44.) This ignored Dr. Mills's and Dr. Woodworth's opinions, which were more restrictive and were mentioned in the same report containing Dr. Morrow's opinion. (Tr. at 36-37.)

Additionally, non-examining consultants such as Dr. Morrow are generally given less weight. The Commissioner has characterized the regulations as prescribing "progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180, at *2. These state consultants "can be given weight only insofar as they are supported by evidence in the case record . . . ." *Id.* Their

probative value depends "on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. § 404.1527(c)(3). Courts therefore accord them less deference. *See Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1202 (9th Cir. 2008) ("'The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." (quoting *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1996))*; Jones*, 336 F.3d at 477 (noting that a reviewing physician's opinion "is due, if anything, less deference than the treating physician's opinion"); *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996) (holding that the opinion of the agency's reviewing physician is insufficient to constitute substantial evidence); *Beasley v. Astrue*, No. 4:08CV106-J, 2009 WL 805126, at *4 (W.D. Ky. Mar. 25, 2009) ("[T]he opinion of a non-examining State agency physician or psychologist is generally entitled to the least weight of all."). *But see Atterbery v. Sec. of Health & Human Servs.*, 871 F.2d 567, 570 (6th Cir. 1989) (finding that the opinion of an agency physician, based on objective records compiled by treating physicians, could constitute substantial evidence).

I do not recommend requiring the ALJ to recontact Dr. Mills and Dr. Woodworth on remand, although I note that she may find it helpful. ALJs now have discretion to decide whether to recontact. 20 C.F.R. §§ 404.1520b(c), 416.920b(c). An older version of the regulations required the ALJ to recontact medical sources if the evidence they provided was inadequate and the "report . . . contains a conflict or ambiguity that must be resolved . . . [or] the report does not contain all the necessary information . . . ." 20 C.F.R. § 404.1512(e)(1) (2011). The core factor influencing the decision was whether the information was inadequate to make a disability determination. *See Borg v. Comm'r of Soc. Sec.*, No. 11-11210, 2011 WL 6955719, at *6 (E.D. Mich. Dec. 11, 2011)

41

(noting that the regulation was "not a mandate" to recontact when "there is no opinion evidence," but only where the evidence submitted by the source is inadequate to determine if the claimant is disabled), *Report & Recommendation adopted by* 2012 WL 28136, at *1 (E.D. Jan. 5, 2012); *York v. Astrue*, No. 11-15-GWU, 2011 WL 5301579, at *5 (E.D. Ky. Nov. 3, 2011) ("The Commissioner's regulations only require the ALJ to recontact a treating source to obtain more information if the evidence is inadequate to make a determination.").

New regulations became effective on March 26, 2012, rendering the decision to recontact discretionary. How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651 (Feb. 23 2012) (codified at 20 C.F.R. § 404.1520b). The Commissioner came to consider the requirement "too rigid at a time when our adjudicators need more flexibility in developing evidence as quickly and efficiently as possible." *Id.* at 10,653. The current regulation simply states, "We may recontact your treating physician, psychologist, or other medical source." 20 C.F.R. §§ 404.1520b(c), 416.920b(c). Again, the decision to recontact is driven by the inadequacy of the evidence in the record. *Id.* Thus, if the record contains sufficient evidence, recontacting sources is unnecessary. *See, e.g.*, *Pierson v. Colvin*, No. 4:12-CV-2095, 2014 WL 988598, at *7 (N.D. Ala. Mar. 13, 2014) ("The record contains inconsistent information, but not insufficient information, so recontacting the Drs. Hayden and Saxon was not necessary."). Yet, in light of the change, the Courts have accordingly stressed that the decision "is left to the discretion of the ALJ." *Cradle v. Colvin*, No. 13-4360, 2014 WL 6633201, at *3 (E.D. Penn. Nov. 24, 2014) (collecting cases); *Thompson v. Colvin*, No. 2:14-cv-00140, 2014 WL 5502457, at *4 (N.D. Ala. Oct. 30, 2014) ("Thus, the new regulations permit, but do not require, an ALJ to re-contact a treating source. Consequently, the ALJ was under no obligation to re-contact Mr. Dale.").

The ALJ's decision here came down on March 27, 2012, a day after the new regulations took effect. Courts have applied the current regulations to decisions made after the effective date, *Cradle*, 2014 WL 6633201, at *1, and have also indicated that they would apply to decisions prior to that date, *Stewart ex rel. J.F. v. Colvin*, No. 1:13CV22-LG-JMR, 2014 WL 1569542, at *8 (S.D. Miss. Apr. 17, 2014) (adopting Report & Recommendation) ("As this is a procedural rule, the new regulations would apply to this case upon remand, and the ALJ would not be required to recontact Dr. Brown."). Applying the new rules, the ALJ can determine whether to recontact. However, obtaining even a brief explanation from Dr. Mills and Dr. Woodworth might elucidate their opinions and assist the ALJ in weighing their worth.

The record very well might contain enough evidence to support the ALJ's conclusions. The treatment gaps, though not as probative as the ALJ claimed, nonetheless might suggest that Plaintiff's impairments lack the necessary severity. Her attempts to work, particularly the possible patent business, also might display significant enough functioning. But the ALJ must assess these issues properly; for example, analyzing whether the work attempts display capability or disability. Recontacting the examining sources could potentially place this information in proper perspective.

### 3.    Conclusion

The record contains evidence that Plaintiff is not disabled. But the only pieces of this the ALJ assembled proved insufficient or erroneous. Consequently, the Court recommends DENYING Defendant's Motion, GRANTING Plaintiff's Motion, and remanding to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings.

### III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  December 23, 2014                    /s Patricia T. Morris
                                            Patricia T. Morris
                                            United States Magistrate Judge